STATE OF VERMONT

ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| Secretary, | } | |
| Vermont Agency of Natural Resources, | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | Docket No. 29-2-08 Vtec |
| | } | |
| Steven Whitham, d/b/a Prospect Mountain, | } | |
| Respondent. | } | |
| | } | |

Decision and Order

On January 27, 2008, the Secretary of the Vermont Agency of Natural Resources (ANR) issued an administrative order pursuant to 10 V.S.A. § 8008 regarding "Prospect Mountain," as Respondent. After Steven Whitham timely requested a hearing in Environmental Court on behalf of Prospect Mountain, the Secretary moved and was granted permission to amend the administrative order to name Mr. Whitham as the Respondent and to correct the location of the water system at issue in this case. Respondent Steven Whitham represents himself; the Secretary of the Agency of Natural Resources is represented by John Zaikowski, Esq.

The Court extended the time for the hearing for good cause at the request of and by agreement of the parties, to accommodate the schedules of the parties and to allow discovery. The Court also extended the time for the issuance of the decision for good cause. No environmental harm resulted from the delay.

The statutes, rules and permits applicable to this matter are 4 V.S.A. Chapter 27; 10 V.S.A. Chapter 48, Groundwater Protection; 10 V.S.A. Chapter 56, Public Water Supply; 10 V.S.A. Chapter 201; and the following sections of the Vermont Water Supply

1

Rules[1] (VWSR) and related federal regulations:  VWSR Subchapter 21-6, § 6.6 and 40 CFR § 141.21 (water quality monitoring for coliform bacteria); VWSR Subchapter 21-6, § 6.8 and 40 CFR § 141.23 (water quality monitoring for nitrate);  VWSR Subchapter 21-10, § 10.1 and 40 CFR § 141, Subpart Q (public notice);  VWSR Subchapter 21-6, § 6.2.3 (microscopic particulate analysis for Ground Water Under the Direct Influence of Surface Water determination).  10 V.S.A. § 8012(c)(2).

Findings

Respondent Steven Whitham owns and operates a very small cross-country ski area known as Prospect Mountain, in Woodford, Vermont.  Respondent works outside of the business in the summer to offset expenses and bring in extra income, but only has an income of approximately $8,000 per year.  Running the ski area has been getting more difficult in recent years due to shorter seasons and less reliable snowfall.  The area primarily serves the local community; some local clubs and schools raise money to keep the area going.

Prospect Mountain serves a transient population during the ski season and includes a restaurant licensed for occupancy of 75 people; the facility provides toilet facilities with handwashing sinks, and provides food service.  The facility provides drinking water to more than twenty-five people per day during its season.  It operates seasonally each year from some time in November or December to some time usually in April, depending entirely on weather and snow conditions, as it has no snowmaking capability.  Its operating season spans three quarterly reporting periods (fourth quarter, first quarter and second quarter) for the ANR program (the Water Supply Division) which administers the Vermont Water Supply statute and rules.  Prior to some time in

---

[1]  Available at
http://www.vermontdrinkingwater.org/wsrule/Vermont%20WSR%20April%202005.pdf

the early 1990s, a division of the Vermont Department of Health had been responsible for the Vermont drinking water (water supply) program.

The Prospect Mountain water system is a public water system that is classified as a "transient non-community water system" under the Vermont Water Supply statute and rules, as it serves at least twenty-five individuals daily on at least sixty days of the year, but is not used by year-round residents or by the same twenty-five or more individuals for more than six months per year. See 10 V.S.A. § 1671; VWSR § 21-2 "Public Water System"

The ANR publishes and maintains on its website[2] a handbook (The T[ransient] N[on-]C[ommunity] Handbook) regarding the requirements for transient, non-community water systems, including an appendix that includes lists of approved laboratories for conducting the various tests required under the Water Supply Rules, and includes three sample public notice flyers for notifying patrons of violations of certain drinking water standards. The TNC Handbook as posted on the website is dated on its front page: "February 2001 Edition," although at page 3 of its text it states that it is updated periodically and also warns that, in the case of any discrepancies between the Handbook and the Water Supply Rules, that the Rules govern. The ANR did not provide either the Water Supply Rules or the TNC Handbook in evidence; no evidence was presented that Respondent had been provided with a copy of either. The Notices of Violation issued to Respondent refer to a "public notice template" and a "public notice certification form" as enclosures; no copies of these templates or forms were provided in evidence, but they may be the same forms as found in the appendix to the TNC Handbook.

---

[2] Available at
www.vermontdrinkingwater.org/tnc/TNChandbookMain.pdf and
www.vermontdrinkingwater.org/tnc/TNCappendices.pdf

The water source for the Prospect Mountain water system is a spring, rather than a drilled well; it therefore is at risk for being affected by (under the influence of) surface water, and for that reason being susceptible to bacterial contamination.

All transient non-community water systems are required to perform certain monitoring of their water, including for total coliform bacteria and for nitrate. Monitoring consists of collecting a water sample according to a prescribed method, having the sample analyzed by a qualified laboratory, and reporting the results to the Water Supply Division. Transient non-community water systems must monitor for total coliform on a quarterly basis, and for nitrate on an annual basis. Such sampling is only required in each quarter in which the system is serving water to the public. In addition to the periodic monitoring, systems using springs or shallow wells are required to do additional testing to determine whether the ground water source is under the direct influence of surface water (GWUDI). If coliform bacteria are detected, more frequent samples may be required.

The presence of coliform bacteria in drinking water is of concern because they are an indicator of the presence of harmful organisms that could cause disease, and may indicate a problem with the water system's treatment system or distribution lines. The presence of particular strains of coliform bacteria (E. coli) indicate that the water may be contaminated with human or animal wastes. Infants, the elderly, and people with compromised immune systems may particularly be at risk. Coliform contamination requires that the water system advise its users that the water must be boiled for at least five minutes before being used for drinking, washing of fruits and vegetables to be eaten raw, and tooth brushing, and that bottled water must be made available.

The presence of elevated nitrate levels in drinking water is a particularly serious concern for infants below the age of six months, who can become seriously ill or die, as their inability to process the nitrate deprives them of oxygen (so-called "blue baby"

4

syndrome). Nitrate contamination requires the use of bottled water, as boiling only makes the nitrate more concentrated.

If the required monitoring for coliform and nitrate is not being done, the water system is required to post or distribute the same public notice as if there has been contamination, and to notify the ANR that the public notice has been accomplished. VWSR § 10.3. The purpose of public notice is so that the users of the system do not rely on the general assumption that drinking water supplied to the public is safe to drink. The public notice may be accomplished by posting, by radio, or by hand or direct delivery, as appropriate to the particular water system. VWSR § 10.2.4. The main consideration is that the water system has done its best to reach every user. A template for the public notice, and a certification form required to be returned to the ANR to show that the public notice has been accomplished, is provided with each notice of alleged violation of the monitoring requirements.

Prior to some time in 2004, although the regulations had required quarterly monitoring for total coliform, the ANR had only been requiring such sampling annually. To assist transient non-community water systems to make the transition to quarterly reporting, for approximately a year to a year-and-a-half prior to the first quarter of 2005, the ANR's Water Supply Division engaged a contractor to go to the operators of these systems, and to teach them how to sample and inform them that sampling would now be required quarterly.

All transient non-community water systems, including Respondent's system, were advised by letter dated December 23, 2004, that the collection and monitoring of routine samples by the Water Supply Division contractor would conclude with the first quarter of 2005, and that thereafter the water systems would be responsible for their own compliance with the total coliform quarterly monitoring, annual nitrate monitoring, and other routine and specifically required follow-up monitoring.

5

Respondent was not open for business in the third quarter (July, August, and September) in any calendar year. Respondent did not open for the 2006–07 season until January 2007, due to a lack of snow in the fourth quarter of 2006. Thus, the quarters in which Respondent was in fact open for business but did not monitor for coliform, after the first quarter of 2005, were the second and fourth quarters of 2005, the first and second quarters of 2006, and the first and second quarters of 2007.[3] The Water Supply Division accepted a sample taken by the Department of Health in the fourth quarter of 2007 to qualify as the required sample for that quarter. Respondent sampled as required for coliform in 2008.

Respondent failed to perform annual monitoring for nitrate for 2005, for 2006 and for 2007. Although as of the date of trial Respondent had not provided an annual sample for nitrate for 2008, he testified to his intention to do so just prior to the ski area's opening for the season towards the end of 2008, which would be sufficient to comply for calendar year 2008.

The bathroom sinks are the only places where the public has independent access to water at the facility. From at least 2006, Respondent had posted hand-printed signs in the bathrooms stating: "Do not drink the water." However, he did not post the specific notices using the "templates" or sample notice forms, regarding the potential dangers of coliform or nitrates, in 2005, 2006, 2007, or the first two quarters of 2008. After receiving the notices of violation, Respondent telephoned the ANR to tell them that he had been posting his own signs, and sent a letter to ANR in January of 2008 to

---

[3] The ANR submitted into evidence the warning letter sent to Respondent regarding his failure to monitor for coliform bacteria in the second quarter of 2005, and the separate Notices of Alleged Violation sent to Respondent for failure to monitor for coliform bacteria for each of the second, third, and fourth quarters of 2006, and the first and second quarters of 2007. The ANR also submitted into evidence the Notices of Alleged Violation sent to Respondent for failure to monitor for nitrate for 2006, and for 2007.

tell them that he had posted his own signs, but did not send ANR the certification notices regarding posting. Health Department inspectors who came twice a year to inspect the restaurant did not state any problem with the hand-lettered signs; Respondent did not distinguish between the apparent acceptance of the signs by the Department of Health personnel and the notices from the ANR, as far as he understood his responsibilities to the state.

Although Respondent was required to perform four additional coliform samples in December 2007, as one did not pass, and to perform five as well in January 2008, the samples taken in February and March of 2008 did pass. While Respondent suspects that the failures were due to his incorrect sampling methods, it is reasonable to conclude that he similarly would have had to have done four additional samples at least once each season had he done the sampling required in the 2005–06 season and in the first two quarters of 2007.

The cost of water sampling for coliform is approximately $15 per sample. The cost of water sampling for nitrate is approximately $50 per sample. The ANR did not present evidence of the avoided cost of delaying the MPA testing from 2007 to 2008, nor of the cost of the public notice and certification to the ANR. Respondent's avoided costs were therefore $150 for the nitrate samples for 2005, 2006, and 2007; plus $270 for the coliform samples, calculated as five coliform samples in the second quarter of 2005 (once plus four additional as discussed in the previous paragraph), seven coliform samples for the 2005–06 season (once in each of three quarters plus four additional as discussed in the previous paragraph), and six coliform samples for the 2006–07 season (once in each of two quarters plus four additional as discussed in the previous paragraph).

In addition to the periodic monitoring for coliform and nitrate, because the source for Respondent's water system is a spring, and is therefore at risk for being "groundwater under the direct influence of surface water" (GWUDI), Respondent was

required to perform a microscopic particulate analysis (MPA) test during the high water period between April 1 and June 1, and to submit the results to the Water Supply Division by July 1. This was a more expensive test, but no evidence was presented as to its cost. However, as this test was done in 2008, the only avoided cost attributable to this test would be one year's interest on the cost of the test.

A representative of the Water Supply Division had inspected the system in March of 2006, but did not send a formal notice to Respondent until February 2, 2007, requiring him to perform microscopic particulate analysis testing between April 1 and June 1 of 2007. Respondent did not perform the required microscopic particulate analysis until the relevant period of 2008; the Water Supply Division ruled as of June 15, 2008, that Respondent's water source was determined <u>not</u> to be under the direct influence of surface water, that is, that it had passed.

The costs of enforcement expended by ANR on this case consisted of approximately 40 hours of one ANR employee's time, at $24 per hour, plus approximately 7½ hours of another employee's time at $22.27 per hour, for a total cost of enforcement of $1127.

<u>Conclusions as to Violation</u> (10 V.S.A. §8012(c)(1)):

The statute requires this Court to determine whether a violation has occurred, 10 V.S.A. § 8012(b)(1), independently of reviewing and determining anew a penalty amount under 10 V.S.A. § 8012(b)(4).

By failing to monitor for coliform during the second and fourth quarters of 2005, the first and second quarters of 2006, and the first and second quarters of 2007, Respondent violated VWSR Subchapter 21-6, § 6.6 and 40 CFR § 141.21 (water quality monitoring for coliform bacteria). By failing to perform annual monitoring for nitrate for 2005, for 2006 and for 2007, Respondent violated VWSR Subchapter 21-6, § 6.8 and 40 CFR § 141.23 (water quality monitoring for nitrate). By failing to perform

8

microscopic particulate analysis in 2007, Respondent violated VWSR Subchapter 21-6, § 6.2.3 (microscopic particulate analysis for Ground Water Under the Direct Influence of Surface Water determination). By failing to post adequate notice incorporating the information on the public notice templates, and by failing to certify to the ANR that the posting had been accomplished, Respondent violated VWSR Subchapter 21-10, § 10.1 and 40 CFR § 141, Subpart Q (public notice).

<u>Determination of Order and Penalty</u> (10 V.S.A. §8012(c)(3)):

The Administrative Order contains no remedial provisions to correct any past violations; rather, it contains directives for future compliance and a penalty. See 10 V.S.A. § 8012(b)(2). Therefore, the Court must determine whether the compliance directives are reasonably likely to achieve the intended result and must review and determine anew an appropriate penalty amount for the violations by applying the criteria set forth in 10 V.S.A. § 8010(b).

<u>Penalty</u>

The Secretary seeks a penalty of $5,270. A civil penalty must be basically remedial in effect, rather than primarily punitive. The methodology inherent in the statute and applied consistently by this Court has been to remove the economic benefit gained from the violation, in order to carry out the statutory purpose of preventing the unfair economic advantage obtained by persons who operate in violation of environmental laws, 10 V.S.A. § 8001(2) and § 8010(b)(5),[4] and then to apply the

---

[4] Effective July 1, 2008, the recapture of economic benefit was separated from the § 8010(b) penalty factors, and now may be recaptured in addition to the maximum penalty amount. Compare §§ 8010(c)(1), (2). See 2008 Vt. Laws No. 191, available at http://www.leg.state.vt.us/DOCS/acts.cfm?Session=2008 and codified in pertinent part at 10 V.S.A. § 8010(c)(2). As Respondent's actions for which penalties are sought occurred prior to the date of this statutory change, 1 V.S.A. § 214 requires application of the prior statute. In the present case, there is no practical difference in the result.

remaining statutory factors to determine what additional penalty is needed, or whether any mitigating factors should reduce any element of the penalty. That is, the entire economic benefit first must be removed to carry out a primary purpose of the Uniform Environmental Enforcement Act: to make it less expensive to comply with the law than to violate it.

Section 8010(b) requires the Court to consider the following factors in determining the amount of the penalty: (1) actual or potential harm to human health and the environment; (2) the presence of mitigating circumstances, including unreasonable delay on the part of the Secretary in seeking enforcement; (3) whether the Respondent knew or had reason to know the violation existed; (4) Respondent's record of compliance; (5) economic benefit gained by Respondent from the violation;[5] (6) deterrent effect of the penalty; (7) actual cost of enforcement; and (8) length of time the violation has existed.

Potential for Harm to Human Health, 10 V.S.A. § 8010(b)(1)

Although Respondent's failure to test and failure properly to warn the system's users of the potential for water contamination did not result in any actual harm to public health, these violations are important due to the potential for harm to human health from untested drinking water and especially if users of a water system are not properly informed of the potential dangers from the untested water.

Mitigating Circumstances, 10 V.S.A. § 8010(b)(2)

Respondent presented evidence of the low-budget nature of his operation and the community support for his low-cost cross-country ski area. That evidence has been considered in the relatively low amount of the total penalty imposed in this case and the relatively low amount necessary in this instance to achieve deterrence and obtain compliance. Respondent's negligible personal profit, or the financial difficulties of the

---

[5] See footnote 4, above.

10

business, however, does not excuse compliance with the laws and regulations required to protect the public health, any more than a not-for-profit organization such as a museum or a hospital, or a public institution such as the state Agency of Transportation, would be excused from compliance with such regulations in the operation of a café, snack bar, water fountain, or state highway rest area.

ANR sought enforcement for the violations at issue within a reasonable time frame. The Court has not found violations for the quarters or periods during which Respondent's ski area was not open for business, even though it was Respondent's failure to communicate with ANR that led it to issue the notices of alleged violation for the summer quarters.

### Whether Respondent Knew or Had Reason to Know the Violation Existed, 10 V.S.A. § 8010(b)(3)

Respondent does not contest that he was made aware of the drinking water testing requirements and the 2005 transition to the water systems' responsibility for carrying out and reporting the required testing. As to the posting of notice, based on the attachments to the Notices of Alleged Violation, he had reason to know that his posting of the hand-lettered notices was not adequate, and that he had to provide certification of posting to the Water Supply Division of the ANR. His subjective belief about the adequacy of his hand-lettered notices was based upon the fact that the Health Department's restaurant inspectors came to the facility twice a year and did not object to the nature of the notices.

### Respondent's Record of Compliance, Duration of the Violation, 10 V.S.A. § 8010(b)(4),(8)

Respondent took three operating seasons: 2005–06, 2006–07, and 2007–08 to come into compliance.

11

Economic Benefit Gained from the Violation, 10 V.S.A. § 8010(b)(5)

Respondent's economic benefit is represented by the avoided cost of doing the testing, for a total of $420.

Deterrent Effect of the Penalty, 10 V.S.A. § 8010(b)(6)

Respondent has come into compliance with the coliform testing requirements, the nitrate testing requirements, and the microscopic particulate analysis requirements, and the system has been determined not to be at risk from the influence of surface water. As of the time of trial the facility was closed for the summer; because Respondent had not performed the 2008 monitoring for nitrate, the public notice requirement remained in effect. All that remains is for Respondent to continue to perform the required testing, to use the required public notice template if the system users have to be notified in the future regarding coliform or nitrate, and to report the public notice properly to the Water Supply Division. Based on Respondent's modest financial situation, a relatively small amount of additional penalty should be adequate to achieve deterrence, that is, to achieve future compliance with the requirements.

Actual Cost of Enforcement, 10 V.S.A. § 8010(b)(7)

ANR's actual cost of enforcement, exclusive of attorney time which was not presented in evidence, was approximately 40 hours of one ANR employee's time, at $24 per hour, plus approximately 7½ hours of another employee's time at $22.27 per hour, for a total cost of enforcement of $1127.

Taking all of the foregoing factors into account, the imposition of a total penalty of $2,000 for the violations is appropriate in the present case, including $1127 in enforcement costs and $420 in economic benefit (avoided cost of compliance), with an additional $453 in recognition of the potential for harm, the need for future deterrence, the length of time it took to achieve compliance, and the other factors discussed above.

12

<u>Prospective compliance</u>

Paragraphs B, C, D, E, F, G, and H of the Administrative Order required Respondent to take the following actions:

Paragraph B required Respondent to "issue Public Notice to the system's users for the failure to monitor for coliform and nitrate," within 15 days of the effective date of the Order. Paragraph C required Respondent to submit copies of the notices and the completed "public notice certification forms" to the Water Supply Division (WSD) of the ANR within 25 days of the effective date of the Order.

Paragraph D required Respondent to conduct coliform monitoring for the system in accordance with the VWSR and submit the results to the WSD within 30 days of the effective date of the Order. Paragraph E required Respondent to conduct quarterly monitoring for coliform commencing with the April 1, 2008 quarter (second quarter of 2008) and every quarter thereafter in accordance with the VWSR and to submit the results to the WSD.

Paragraph F required Respondent to conduct nitrate monitoring for the system according to the VWSR and to submit the results to the WSD within 30 days of the effective date of the Order.

Paragraph G required Respondent to collect a water sample from the system between April 1 and June 1 of 2008, and to conduct microscopic particulate analysis (MPA) testing on it in accordance with the VWSR. Paragraph H required Respondent to submit the results of the MPA testing to the WSD for review no later than July 1, 2008. Respondent has complied with paragraphs G and H, so that the system was ruled to be exempt from further requirements regarding GWUDI as of June 15, 2008.

The order sections are therefore reasonably likely to achieve the intended result, with modifications recognizing that Paragraphs G and H have been complied with, and that the remaining requirements are prospective only.

13

Accordingly, taking all these factors into account, and based on the findings, conclusions, and reasoning of this decision, it is hereby ORDERED and ADJUDGED that:

Paragraph A of the January 27, 2008 Administrative Order is vacated. On or before May 1, 2009, Respondent shall pay a total penalty of $2000 for the violations, to the State of Vermont, to be deposited in the general fund pursuant to 10 V.S.A. §8010(e). Respondent and the ANR may discuss a payment schedule and propose it to the Court as a modification of this order.

Paragraphs B, C, D, E, F, G, and H are modified to read as follows, in light of the evidence as to compliance as of the date of trial, and, as modified, are affirmed:

B.      In the event that any required monitoring for coliform is not conducted or is not timely conducted, or tests positive, Respondent shall immediately contact the Water Supply Division at 1-800-823-6500 or 802-241-3400 and within 24 hours shall issue Public Notice to the system's users as provided in the current version of the TNC Handbook or as otherwise instructed by the Water Supply Division.

C.      In the event that any required monitoring for nitrate is not conducted or is not timely conducted, or tests positive, Respondent shall immediately contact the Water Supply Division at 1-800-823-6500 or 802-241-3400 and within 24 hours shall issue Public Notice to the system's users as provided in the current version of the TNC Handbook or as otherwise instructed by the Water Supply Division.

D. & E.      Respondent shall continue to conduct the monitoring for coliform as required by the Vermont Water Supply Regulations once in each quarter in which Respondent is open to the public, which the ANR expects normally to be in the first, second and fourth quarters of each year.

14

F. Respondent shall continue to conduct the monitoring for nitrate as required by the Vermont Water Supply Regulations once in each year in which Respondent is open to the public; Respondent expects normally to conduct the required nitrate monitoring in the late fall of each year, prior to opening for business.

Rights of Appeal (10 V.S.A. §§ 8012(c)(4) and (5)):

WARNING: This decision will become final if no appeal is requested within 10 days of receipt of this decision. Respondent and the Secretary of the Agency of Natural Resources have a right to appeal this decision. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to the Vermont Rules for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6). Within 10 days of receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of this Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Supreme Court for a stay under the provisions of V.R.C.P. 62 and V.R.A.P. 8.

Done at Berlin, Vermont, this 2nd day of March, 2009.

_____
Merideth Wright
Environmental Judge

15